Milton N. LYNN Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–732 C.

United States Court of Federal Claims.

Dec. 19, 2003.

Gary R. Myers, Weare, NH for plaintiff.

John S. Groat, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, Civil Division, U.S. Department of Justice, Washington, DC for defendant. Major Vanessa A. Crockford and Capt. Steven D. Bryant, Office of the Judge Advocate General, Department of the Army, Arlington, VA, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiff, asserting jurisdiction under 28 U.S.C. § 1491 (2000), seeks relief in this court for damages arising from three decisions by the Army Board for Correction of Military Records (ABCMR) finding that plaintiff's retirement on June 30, 1996 was voluntary. Complaint (Compl.) ¶¶ 1, 4, 15; Administrative Record (AR) at 7, 48, 120. Plaintiff seeks reinstatement to active duty and back pay from the date of retirement to the date of reinstatement. Compl. at 4. Upon request of the parties, by its Order of September 23, 2002, the court remanded this matter to the Deputy Assistant Secretary of the Army for Army Review Boards, Mr. Karl F. Schneider. Plaintiff's retirement was again found to be voluntary. AR at 2.

Now before the court are Plaintiff's Motion for Review of Decision on the Basis of Administrative Record (Pl.'s MSJ or plaintiff's motion) filed on April 4, 2003 and Defendant's Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, for Judgment on the Administrative Record, and Defendant's Opposition to Plaintiff's Motion for Judgment on the Administrative Record (Def.'s MTD or defendant's motion) filed on June 23, 2003, which have been fully briefed. Upon request of plaintiff, the parties presented oral argument on these motions on December 2, 2003. *See* Order of November 20, 2003. The court also has before it an extensive evidentiary record generated by three decisions of the Army Board for Correction of Military Records and a decision on remand by the Deputy Assistant Secretary of the Army for Army Review Boards, as well as a letter to plaintiff from the Army Office of the Inspector General Assistance Division (IG Letter), AR at 44–47, prepared as a final response to plaintiff's request for an inquiry

into his retirement. For the following reasons, the court GRANTS defendant's motion.

## I. Background

Both parties agree that the primary issue in this controversy is whether plaintiff Lieutenant Colonel Milton N. Lynn's retirement from the United States Army on June 30, 1996 was voluntary. *See* Pl.'s MSJ at 4; Def.'s MTD at 1. In April 1994 plaintiff was experiencing health problems, and underwent a medical evaluation which produced a "P3" level of limitations on physical work activities. AR at 340. Plaintiff had over twenty years of service in the Army at this time, AR at 33, and was eligible for voluntary retirement under Army Regulation 635–100 Personnel Separations, Officer Personnel ¶ 4–13(a)(1) (May 1, 1989). Plaintiff was scheduled for a mandatory work reassignment in the summer of 1994, Def.'s MTD at 3–4, and he did not wish to be reassigned, AR at 46, 243. As plaintiff stated in a 1996 memorandum (contesting the results of his disability evaluation): "I was going to retire if the [Military Occupational Specialty/Medical Retention Board (MMRB) ] was not held rather than go to a new assignment ...." AR at 243.

In the spring of 1994, plaintiff prepared an application for voluntary retirement with the assistance of Bruce Jefferson, a Retirement Analyst at Fort Hood. AR at 33–34, 74. Plaintiff signed the application on May 6, 1994 and obtained his unit commander's initials on the application. AR at 1, 33–34. Concurrently, plaintiff was seeking review of his health condition through the Army's disability evaluation system and was waiting for the convening of an MMRB, a board associated with the disability evaluation system. Plaintiff's Statement of Facts (Pl.'s Facts) ¶ 10.[1] Mr. Jefferson, in a 1996 letter addressed "To Whom It May Concern," recounts the manner in which plaintiff submitted his voluntary retirement application: "Lieutenant Colonel Lynn requested that I prepare his Request for Retirement Memorandum. Upon returning the memorandum, LTC Lynn stated that he was waiting for notification of a[n] [MMRB], and I was not to forward the memorandum until he informed me." AR at 74.

Plaintiff's assignment officer was apparently also aware that Mr. Jefferson was holding plaintiff's completed retirement application. AR at 243.[2] As plaintiff explained in his 1996 memorandum, the MMRB was delayed due to "field problems and the time it required to obtain six ... colonels for the board." *Id.* The assignment officer, who apparently had been delaying plaintiff's reassignment orders until the MMRB was convened but who could wait no longer, called Mr. Jefferson and directed him to forward plaintiff's retirement application for processing. *Id.*; Def.'s MTD at 5; Pl.'s Facts ¶ 13. Plaintiff's retirement application was processed and approved, resulting in orders generated on August 18, 1994 scheduling plaintiff's retirement for May 31, 1995. AR at 284.

Plaintiff received notice that his retirement application had been approved when his initial retirement orders were issued on August 18, 1994. AR at 74, 284. He delayed asking for his retirement orders to be revoked, because he expected his disability evaluation to be completed before the May 31, 1995 effective date of his retirement. AR at 74. Because his disability evaluation took longer than expected and would not be completed by the May 31, 1995 retirement date, plaintiff asked that his retirement orders be revoked, an action that would suspend his scheduled retirement date.[3] AR at 45, 74. The retirement orders were revoked on May 18, 1995,

---

1. Facts cited to filings of only one of the parties do not appear to be in dispute.

2. Plaintiff's description of the 1994 events in his 1996 memorandum suggests that the assignment officer knew of the whereabouts of the completed voluntary application:

    Since my assignment officer had waited (without any luck) all summer for the MMRB to convene and cut the flagging orders, he was

    forced to cut PCS orders [i.e., reassignment orders] on me immediately. Therefore in mid-August 1994 he called Fort Hood retirement section and [Mr. Jefferson] mistakenly faxed the package to the Personnel Command.
    AR at 243.

3. See Section II.B.2 for a full discussion of the revocation of retirement orders.

approximately two weeks before plaintiff's scheduled retirement, thereby suspending the effective date of plaintiff's retirement pending disability processing. AR at 2, 285.

The Army physical disability system proceedings were extensive, including "an MMRB on 26 August 1994, an MEB [Medical Evaluation Board] on 9 November 1994, [and] PEB's [Physical Evaluation Boards] on 13 March 1995, 11 April 1996, and 23 April 1996 (formal)." AR at 42. These proceedings culminated in a final determination issued on May 31, 1996, finding plaintiff fit for active duty in his specialty. AR at 255. This determination also directed that "[i]f this soldier was scheduled for separation or retirement for reasons other than physical disability, that separation or retirement action may continue." *Id.* On June 10, 1996, new orders scheduling plaintiff's retirement were issued, with an effective retirement date of June 30, 1996. AR at 250. Plaintiff retired on June 30, 1996. Compl. ¶ 4.

## II. Discussion

### A. Standard of Review

■ This court has jurisdiction under the Tucker Act "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). A plaintiff must not rely solely on the Tucker Act, however; he must also "assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998). A military officer is entitled to basic pay as " 'a member of a uniformed service who is on active duty.' " *Adkins v. United States*, 68 F.3d 1317, 1321 (Fed.Cir.1995) (quoting 37 U.S.C. § 204(a)(1) (2000)). If a military officer's retirement was "involuntary and improper, [the officer's] statutory right to pay was not extinguished, and ... serves as a basis for Tucker Act jurisdiction." *Id.* "If, however, [the officer's] retirement was 'voluntary,' he retained no statutory entitlement to compensation, and thus no money-mandating provision would support Tucker Act ju-

risdiction over his claim." *Id.* (citing *Sammt v. United States*, 780 F.2d 31, 32–33 (Fed.Cir. 1985)).

When asserting jurisdiction, plaintiff is entitled to rely on the allegations in the complaint, which are favorably construed by the court. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("[I]t is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). However, "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint (here, alleged involuntariness) are challenged." *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed.Cir.1999). "If a motion to dismiss for lack of subject matter jurisdiction ... challenges the truth of the jurisdictional facts alleged in the complaint, the ... court may consider relevant evidence in order to resolve the factual dispute." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

"Because the motion is brought pursuant to [the predecessor rule to RCFC 12(b)(1) ] and raises jurisdictional issues, the filing of materials outside the pleadings does not call for consideration of the motion as one for summary judgment." *Al Johnson Constr. Co. v. United States*, 19 Cl.Ct. 732, 733 (1990). The court may review the record and resolve disputed facts. *Id.* ("While the unchallenged allegations of the complaint are taken as true for purposes of ruling on the motion, the court may inquire, by affidavits or otherwise, into facts necessary to support jurisdiction, and may resolve disputed facts." (citation omitted)). Plaintiff must adduce "relevant, competent proof to establish jurisdiction." *Puerto Rico v. United States*, 44 Fed.Cl. 618, 621 (1999) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). Plaintiff "bears the burden of establishing subject matter jurisdiction by a preponder-

ance of the evidence." *Reynolds,* 846 F.2d at 748.

The court must determine, in this voluntariness inquiry, whether plaintiff has made a free choice to retire. *See McIntyre v. United States,* 30 Fed.Cl. 207, 211 (1993) ("The focus of [the voluntariness] inquiry is whether the plaintiff exercised a free choice in making the resignation or retirement decision."). A resignation from the military is presumed to be voluntary. *Tippett v. United States,* 185 F.3d 1250, 1255 (Fed.Cir.1999); *Moyer,* 190 F.3d at 1320. However, "[a]n otherwise voluntary resignation ... is rendered involuntary if it ... results from misrepresentation or deception on the part of government officers." *Tippett,* 185 F.3d at 1255 (citing *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574 (Fed.Cir.1983) and *Covington v. Dep't of Health & Human Servs.,* 750 F.2d 937, 942 (Fed.Cir.1984)). "[T]he misinformation must be such that a 'reasonable person would have been misled.'" *Id.* at 1258 (quoting *Scharf,* 710 F.2d at 1575). "'[I]f the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary.'" *Id.* at 1255 (quoting *Covington,* 750 F.2d at 942).

For the purposes of establishing jurisdiction based on a retirement rendered involuntary because of misrepresentation, plaintiff must show that "specific misinformation, deception or improper advice" was given that would have misled a reasonable person and that plaintiff relied on the misinformation. *Heaphy v. United States,* 23 Cl.Ct. 697, 702 (1991). This is an objective test which does not require inquiry into the subjective perceptions of plaintiff. *Bergman v. United States,* 28 Fed.Cl. 580, 588 (1993).

Finally, under certain circumstances a retirement or resignation may also be involuntary if an employee "'unsuccessfully tries to withdraw his resignation before its effective date.'" *Id.* at 585 (citation omitted).

## B. Whether Lieutenant Colonel Lynn's Retirement Was Voluntary

Plaintiff advances two theories to support his claim that his retirement was involuntary and thus within the jurisdiction of this court. *See* Pl.'s MSJ at 11–15. The first is that "misinformation was surely negligently or innocently supplied" by Mr. Jefferson, upon which plaintiff relied to his detriment, "render[ing] the retirement involuntar[y]." [4] *Id.* at 11–13. The second theory is that plaintiff made "an attempt to withdraw" his voluntary application for retirement and was refused in circumstances which rendered the retirement involuntary. *Id.* at 14 ("The reinstatement of voluntary retirement orders on June 10, [1996] was ... not voluntary."). The court considers these theories in turn.

### 1. Allegation of Misrepresentation of Material Information

The "statement" that plaintiff claims to be a misrepresentation of material information is Mr. Jefferson's acceptance of plaintiff's retirement application to be held by Mr. Jefferson and not forwarded without further communication from plaintiff. *See id.* at 13 (describing the "statement" as "the representation, implied or expressed, from Mr. Jefferson that the application would not be submitted"). The court must decide whether Mr. Jefferson's conduct in these circumstances constituted misrepresentation of material information which would have misled a reasonable person into a reasonable belief in the existence of a right to file a conditional, voluntary retirement application, and whether plaintiff relied on such conduct to his detriment.

There is no evidence in the record that Mr. Jefferson made an express statement that plaintiff's retirement application, if left in Mr. Jefferson's office, would not be forwarded

---

4. Plaintiff presents this theory as two related propositions. First, "[p]laintiff's delivery of the retirement application to Mr. Jefferson was conditional." Pl.'s MSJ at 11–12. Second, "[p]laintiff operated on the good faith belief that he could deliver the retirement application to Mr. Jefferson on a conditional basis and that he could cancel that application once delivered" because "[p]laintiff relied upon the representation, implied or express[], from Mr. Jefferson that the application would not be submitted." *Id.* at 12–13. The court finds that these propositions together comprise plaintiff's theory that Mr. Jefferson's conduct was a misrepresentation of material information that rendered the retirement application involuntary.

without further communication from plaintiff. Plaintiff contends, however, that the act of accepting the application on the terms it was offered by plaintiff was "misinformation by silence." *Id.*

There is no regulatory provision permitting the conditional filing of a signed voluntary retirement application, with processing to be suspended until a disability evaluation process is finalized. *See generally* Army Reg. 635–100 ¶¶ 4–1 to 4–37 (retirement). The published personnel procedures do not contemplate holding a voluntary application once submitted. *See* Army Pamphlet 600–8–11 Military Personnel Office Separation Processing Procedures, Procedure 1–5, Voluntary Retirement of Officers/Warrant Officers, at 29–30 (July 1, 1984) (showing review, notice and forwarding actions for submitted voluntary retirement applications but not indicating that a conditional hold possibility exists). Under the applicable regulations, plaintiff had no authority for his request that Mr. Jefferson hold the retirement application, and Mr. Jefferson had no authority to do so. *See* AR at 75 (stating in a 1996 Inspector General letter that "[y]our retirement application should have been processed immediately upon its submission to AG; however, it was held at your request. Appropriate action was taken to ensure this does not happen in the future."). In asking Mr. Jefferson to do something not authorized by Army Regulations, plaintiff appears to have requested a favor of Mr. Jefferson, so that plaintiff could easily resort to a back-up measure he thought he needed in case of a delay in his disability evaluation process. *See* AR at 12 (stating the conclusion of the ABCMR that "[t]he retirement application was apparently a backup measure because the applicant was facing reassignment").

Although Mr. Jefferson lacked regulatory authorization, by accepting plaintiff's completed retirement application and putting it into what he termed the "suspense file," AR at 74, plaintiff contends that Mr. Jefferson made at least a non-verbal statement that must be tested under the misrepresentation standard developed by the Federal Circuit in involuntary retirement cases, *see* Pl.'s MSJ at 12–13.

In a leading civilian pay case, the Federal Circuit examined a misrepresentation by the United States that rendered a retirement involuntary. *Scharf,* 710 F.2d at 1574–75. In *Scharf,* the petitioner, a civilian employee of the federal government, had submitted an "application for optional retirement" but later discovered that his health did not permit him to continue working up until his retirement date. *Id.* at 1573. He consulted a counselor at the agency where he worked about how to manage his sick time, his optional retirement and a disability retirement application. *Id.* at 1573–74. The counselor gave incorrect advice which foreclosed Mr. Scharf's most advantageous course of action, which would have been to withdraw his optional retirement application and to collect all of his sick time at full pay before going on disability retirement. *Id.* at 1574. There was evidence that the counselor made a misleading statement to Mr. Scharf, stating that if he did not withdraw his optional retirement and later got disability retirement, the " 'optional retirement would be set aside and he would go on disability retirement.' " *Id.* at 1575. The court found that the agency had "affirmatively misled the petitioner about his retirement rights." *Id.* at 1575 n. 3. The statement was "highly misleading and materially affected the petitioner's decision regarding retirement" because

> [a] reasonable person would certainly have concluded from the advice received that there would be no adverse consequences if an optional retirement preceded a disability retirement. Furthermore, it was reasonable for petitioner to rely on the advice of his retirement counselor, and he did in fact rely on this advice in good faith.

*Id.* at 1575. Because Mr. Scharf, "indisputably a reasonable man, in good faith, justifiably relied on this misleading advice to his detriment, ... petitioner's optional retirement from the federal civil service was an involuntary retirement." *Id.*

In contrast to the retirement advice discussed in *Scharf,* the court finds that in this case Mr. Jefferson's conduct was not "highly misleading." Indeed, it was not advice of any sort. Mr. Scharf sought advice as to what the retirement rules were in order to

act in accordance with them. In this case plaintiff had decided to initiate a voluntary retirement application and asked Mr. Jefferson for a favor in the handling of his application that was not contemplated by the rules governing that application process. Plaintiff had achieved the rank of lieutenant colonel, AR at 34; Mr. Jefferson was a civilian retirement analyst, working as a technician within the Transition Command at Fort Hood, Texas, AR at 45, 74, 243; Plaintiff's Written Response to the Court's Order of November 25, 2003 (Pl.'s Resp.) at 1. Mr. Jefferson complied with an officer's request for an accommodation outside the rules. AR at 74. Mr. Jefferson provided that accommodation until he was ordered to forward the application by plaintiff's assignment officer. AR at 243; *see also* AR at 74 (stating that Mr. Jefferson forwarded plaintiff's retirement application at the request of someone in the assignment branch); Pl.'s Resp. at 2 ("The Branch Manager had control over Mr. Lynn in the sense that he could assign Mr. Lynn to a new assignment."). Mr. Scharf was given incorrect benefits information that was material to his retirement decision. In this case there is no evidence that plaintiff asked for and was given misinformation about the risks associated with attempting to submit conditionally a completed retirement application. The court finds that Mr. Jefferson's agreement to plaintiff's request to hold the retirement application was an acquiescence to plaintiff's request, not a misleading statement regarding retirement rights.

In *Covington*, another civilian pay case decided by the Federal Circuit, a federal civilian employee received a reduction-in-force (RIF) notice that stated, "without qualification, that the agency was going to be abolished and that [the plaintiff] had no right of assignment to another position." 750 F.2d at 942. Included in the notice was information regarding Mr. Covington's retirement annuity benefits. *Id.* at 939 ("Since Coving-

ton was eligible for an immediate retirement annuity, information concerning benefits of discontinued service retirement was included in the notice."). The RIF notice was materially in error. *Id.* at 942. First, the notice incorrectly advised "that [Covington] would have no opportunity to be reassigned." *Id.* Also, the notice "failed to state that his involuntary [discontinued service] retirement might forfeit any rights that he would otherwise have in appealing the agency's RIF action." *Id.* at 943. Because he was told he had no assignment rights, and because he was not told that electing a discontinued service retirement "would preclude a later appeal," Mr. Covington made what the court described as "[a] decision made with blinders on." *Id.* (internal quotation omitted). The court held that the information that Mr. Covington received from his government employer "was misleading and erroneous in material ways," was reasonably relied upon, and that Mr. Covington's retirement decision was involuntary. *Id.* at 942.

In contrast to the misinformation discussed in *Covington*, Mr. Jefferson did not provide materially erroneous information that plaintiff relied upon. Mr. Covington was specifically told he had no assignment rights, which was in error. Plaintiff was not told he had the right to have Mr. Jefferson hold his completed retirement application— Mr. Jefferson simply acquiesced when presented with the completed retirement application. Mr. Covington was given information that led him to believe a discontinued service retirement was his best option, and was not informed of material information about his rights that would have controverted that belief. Plaintiff here made his decision to file his retirement application apparently before consulting Mr. Jefferson, based on correct but incomplete information that obtaining an approved voluntary retirement was a successful block to reassignment in the Army.[5]

5. The parties now agree that Mr. Lynn was mistaken in believing, at the time he filed his retirement application, that he could not block reassignment by reason of his medical problems until he was formally referred into the Army's disability evaluation system. Transcript of December 2, 2003 Oral Argument (Tr.) at 49. Before the MMRB convened, it appears that his P3 permanent disability profile, an earlier step in his medical review by the Army, could have blocked his reassignment, even if PCS (Permanent Change of Station) orders had been issued. *See* Army Regulation 600–60 Physical Performance Evaluation System ¶ 2.6 (Oct. 31, 1985) ("Assignments (a) .... Prior to proceeding on assignment instructions, all soldiers possessing a '3' or '4' perma-

There is no evidence in the record that Mr. Jefferson provided plaintiff with erroneous information about retirement alternatives.

Beginning with *Sammt*, the Federal Circuit recognized the applicability of the involuntariness analysis of civilian personnel separations, such as that used in *Covington*, to military personnel separations. *See Sammt*, 780 F.2d at 32 ("[W]e conclude, as we have in civilian pay cases, that the exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative.") (citing *Covington*, 750 F.2d at 942). When the Court of Federal Claims and its predecessor, the Claims Court, have tested military resignations or discharges for involuntariness due to misrepresentation, the courts have dismissed several cases for lack of jurisdiction. *Moyer v. United States*, 41 Fed.Cl. 324, 330 (1998), *aff'd*, 190 F.3d at 1320–21; *Nickerson v. United States*, 35 Fed. Cl. 581, 588 (1996); *Bergman*, 28 Fed.Cl. at 587–89; *Heaphy*, 23 Cl.Ct. at 702–03. This court has also found a military retirement to be voluntary under the *Covington* analysis for involuntariness due to misrepresentation. *Kim v. United States*, 47 Fed.Cl. 493, 496–503 (2000) (dismissing on failure to state a claim grounds). One decision has concluded, based on the *Covington* analysis of misrepresentation, that a military resignation, discharge or retirement might have been involuntary. *See Tippett*, 185 F.3d at 1255, 1258 (stating that the plaintiff alleged facts that are "sufficient to make out a prima facie case of involuntariness" and remanding the case for further proceedings).

Captain Tippett had received an adverse Officer Efficiency Report which stated that his "extra-marital relationship had contributed to the degradation of Tippett's unit and had prevented Tippett from properly motivating his subordinates." *Id.* at 1251–52. Because Captain Tippett faced possible disciplinary action, he was ordered to show cause why he should be retained on active duty and was told that he had three options: submitting a resignation, requesting discharge or "appear[ing] before a board of inquiry in order to show cause for retention." *Id.* at 1252. Captain Tippett obtained advice from

two Army Trial Defense Service lawyers regarding his best course of action and his eligibility to join the Reserves. *Id.* at 1252–53. This representation lasted about a year and, at one point, one of the lawyers stated that he would "'double check with both PERSCOM [Total Army Personnel Command] and the Department of the Army to make sure [his advice] was correct.'" *Id.* at 1252 (quoting the complaint). One of Captain Tippett's lawyers was eventually reprimanded for a conflict of interest in his representing Captain Tippett after having worked on the Staff Judge Advocate investigation of Captain Tippett's extra-marital relationship. *Id.* at 1253. Captain Tippett asserted that some of the advice he received was erroneous. *Id.* at 1255.

The alleged erroneous advice included the omission to inform Captain Tippett that his discharge papers would include a negative notation, and the incorrect assurance that he would be eligible for an appointment in the Reserves. *Id.* at 1256–57. Captain Tippett signed a request for discharge and received a standard separation document that stated the reason for separation was "'Misconduct, Moral or Professional Dereliction.'" *Id.* at 1252–53. When Captain Tippett requested an appointment in the Reserves, the Army found him to be ineligible due to his type of discharge. *Id.* at 1253–54. Due to the procedural posture of the case, the court remanded Captain Tippett's case to the Court of Federal Claims for an evidentiary hearing. *Id.* at 1258. The court stated, however, that "Tippett has asserted facts, if proven, that are sufficient to make out a prima facie case of involuntariness." *Id.*

The distinctions between the misinformation discussed in *Tippett* and the conduct of Mr. Jefferson are many. Captain Tippett was represented by attorneys who advised him of alternatives to disciplinary proceedings and who gave him assurances that the advice had been "double check[ed]." *Id.* at 1252. In this case, Mr. Jefferson merely accepted a completed retirement application and did not refuse plaintiff's request to hold the application until plaintiff contacted him; he did not advise plaintiff about what actions

nent physical profile will be evaluated by an                    MMRB."); Tr. at 48–50.

plaintiff should take. *See* AR at 74. Captain Tippett asked specific questions regarding his best course of action and his eligibility for the Reserves, and claimed to have received erroneous advice. *Id.* at 1252, 1255. Plaintiff has not alleged that he asked Mr. Jefferson for advice regarding his legally authorized alternatives, which appear to have been limited to either submitting his application for immediate processing or retaining possession of the completed application.

Plaintiff has not shown that he asked for material information regarding how to submit a voluntary retirement application or that he received erroneous information in return. Nor has plaintiff shown that he asked for advice about how to prevent reassignment or how to obtain a disability retirement, which appear to have been his primary objectives, or that he received erroneous information on those topics. *See* AR at 243 (writing in 1996, plaintiff stated: "I was going to retire ... rather than go to a new assignment ...."); Compl. ¶ 11 ("Plaintiff was awaiting information regarding a potential medical retirement."). Plaintiff has not proved that Mr. Jefferson offered "specific misinformation, deception or improper advice," *Heaphy,* 23 Cl.Ct. at 702, that would have misled a "reasonable person," *Bergman,* 28 Fed.Cl. at 588. Absent specific examples of misrepresentation that would rise to the level that existed in *Scharf* and *Covington,* "a resignation will not be found to have been involuntary for purposes of jurisdiction." *Heaphy,* 23 Cl.Ct. at 702. The court concludes that plaintiff has not carried his burden of showing that defendant misrepresented material information that would have misled a reasonable person.

Even assuming that plaintiff had received misinformation through Mr. Jefferson's conduct, plaintiff would still have to show that he "materially relie[d] on the misinformation to his detriment." *Covington,* 750 F.2d at 942. The favor requested of Mr. Jefferson appears to have been of little or no importance in plaintiff's plan to avoid reassignment by applying for voluntary retirement as a back-up

measure in case he did not get into the disability evaluation system in time. In plaintiff's 1996 memorandum contesting his failure to get a disability retirement, he stated that he needed retirement orders to prevent reassignment: "Although no one was [to] blame for the delay, however, if the [MMRB] had convened in a timely manner, there would not have been a need for the retirement orders." AR at 243. Plaintiff believed that because of the delay in convening the MMRB he needed retirement orders to block reassignment. *See* Tr. at 11 ("Mr. Lynn's interpretation of the regulation was, obviously, that the MMRB was the time at which he could not be reassigned."). Plaintiff has not shown that he relied upon Mr. Jefferson's acquiescence to his request not to forward the completed retirement application, because it appears from the record that plaintiff wanted retirement orders to block reassignment, regardless of who made the telephone call that authorized the forwarding of the application. *See* AR at 243.

During the summer of 1994, when plaintiff was due for reassignment, he was offered two reassignment options and turned both of them down. AR at 46 (IG Letter stating that plaintiff was "initially offered Panama and then a Deputy District Engineer position in New York ... [but] declined the positions"). His assignment officer [6] reported that plaintiff "asked to retire instead." *Id.* Plaintiff, with the assistance of his assignment officer and Mr. Jefferson, was able to execute the voluntary retirement plan that he had prepared for this contingency. *See* AR at 243 ("I was going to retire if the MMRB was not held rather than go to a new assignment and [not be able to] perform."). There is no contemporaneous evidence that plaintiff was dissatisfied with the forwarding of his retirement application. Indeed, at least eight months passed after plaintiff received notice of his approved retirement application on August 18, 1994 before plaintiff authorized a request to revoke his retirement orders.[7] Because plaintiff's plan moved for-

---

6. "Branch Manager and Assignment Officer are one in [sic] the same person. This person was responsible for assuring Mr. Lynn's career and assignment progression." Pl.'s Resp. at 1.

7. On September 23, 1994, the MMRB directed plaintiff to undergo an MEB. AR at 129. This development in his disability evaluation was the one plaintiff had been waiting for to be able to

ward in a way consistent with his understanding at the time of his best interests, the court does not find that plaintiff relied on Mr. Jefferson's conduct.[8] The evidence before the court supports the view that plaintiff made a voluntary decision to retire based on his perceived need to prevent reassignment. The evidence does not support the theory that plaintiff's retirement was rendered involuntary because he allegedly relied on Mr. Jefferson's acquiescence in his request to hold his application unfiled. Because the court finds that plaintiff did not rely on the conduct of Mr. Jefferson, there is no need to examine whether plaintiff suffered a detriment because of the forwarding of his retirement application.

The court finds that Mr. Jefferson's conduct does not constitute a misrepresentation on which Colonel Lynn could have relied to his detriment. Mr. Jefferson's conduct in the circumstances of this case could not render a voluntary retirement involuntary under the governing case law.

2. Whether There Was a Frustrated Attempt to Withdraw Retirement Application

■ Plaintiff asserts that the court should "treat[ ] this retirement as involuntary ... [because] [p]laintiff attempted to withdraw or revoke his retirement orders." Pl.'s MSJ at 13. In a civilian pay case, the Court of Claims held that a voluntary resignation was "deemed to be withdrawn" when procedural rights of withdrawal had been withheld. *Cunningham v. United States*, 191 Ct.Cl. 471, 423 F.2d 1379, 1383–85 (1970). Thus, a frustrated attempt to withdraw a voluntary retirement request or a resignation may render that separation involuntary and give jurisdiction in this court. *Gallucci v. United States*, 41 Fed.Cl. 631, 638 (1998) ("[U]nder certain circumstances plaintiff may defeat the presumption of voluntariness by demon-

strating that he made an attempt to withdraw the resignation before the effective date, but was summarily refused.") (citing *Cunningham*, 423 F.2d at 1384–85).

■ In *Cunningham*, a civilian employee of the Air Force submitted her resignation on May 23, 1959 with an effective date of June 12, 1959. 423 F.2d at 1380. Shortly after submitting her resignation, she orally requested to withdraw it, but this request was orally denied. *Id.* She then submitted a written request to withdraw her resignation two days later, stating that a misunderstanding of her supervisor's comments about her "job progress" had led her to resign and that, after realizing her error, "she withdrew her resignation." *Id.* at 1380–81. Three days later her request to withdraw the resignation was denied. *Id.* at 1381. The denial stated that " 'it is not considered to the mutual advantage of yourself and the Air Force to withdraw this resignation. You will therefore be separated by voluntary resignation effective 12 June 1959.' " *Id.* Ms. Cunningham requested grievance hearings from both the Air Force Grievance Committee and the Civil Service Commission. *Id.* When she appealed the Air Force's and the Civil Service's decisions that denied her request to withdraw her resignation, Ms. Cunningham alleged that " 'insuperable duress' " forced her resignation, but both the Air Force and the Civil Service denied her an opportunity to prove that duress. *Id.* at 1383–84. The court found that the grievance procedures she received were not adequate. *See id.* at 1382–83 (stating that the Air Force violated the governing regulations by holding a hearing "in [Ms. Cunningham's] absence and without her participation" and that the Civil Service proceedings failed to "accord[ ][her] the rights accorded her [by statute]"). Because her attempted withdrawal of her resignation was denied over two weeks before its effective date, and because violations of stat-

---

block his reassignment. *See* Tr. at 11 (stating that plaintiff believed that the MMRB processes would block his reassignment). Plaintiff's request for revocation of his retirement orders was not submitted until May 1995. AR at 45, 74.

8. There is conflicting evidence as to whether plaintiff authorized the forwarding of his submitted retirement application. *Compare* AR at 46

(summarizing a memo from the assignment officer who "stated that [plaintiff] declined the positions and asked to retire instead") *with* AR at 74 (stating, in a memo written by Mr. Jefferson, that the "personnel officer [assignment officer] did not have LTC Lynn's permission to process the request [for retirement]").

ute and regulation voided the grievance procedures appealing that denial, the court held that Ms. Cunningham was "not lawfully separated or removed" and granted back pay. *Id.* at 1385. The court in *Cunningham* determined that the denial of specific procedural rights related to an employee's timely request to withdraw a resignation voids the agency's determination that the resignation was voluntary. *Id.* at 1382.

In the military pay context, "strong policy reasons compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.'" *Voge v. United States,* 844 F.2d 776, 782 (Fed.Cir.1988) (quoting *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979)). "The Secretary [of the Army] can exercise discretion to accept [a resignation] or not, and allow the withdrawal [of a resignation] or not, and his decision will be sustained if not arbitrary and capricious and contrary to law." *Cole v. United States,* 231 Ct.Cl. 702, 689 F.2d 1040, 1041 (1982). The Army's decision of whether or not to accept a withdrawal of a resignation "must be granted substantial deference." *Brown v. United States,* 30 Fed.Cl. 227, 231 (1993).

In *Gallucci,* a Marine Corps captain was faced with two choices after assaulting an enlisted man: he could choose between voluntary resignation under the Voluntary Severance Incentive (VSI) program or administrative separation proceedings of "uncertain consequences." 41 Fed.Cl. at 634–35. On May 18, 1994, Captain Gallucci submitted a VSI application, "to avoid the [general's] recommendation for administrative discharge." *Id.* at 636. Captain Gallucci was aware that "'the decision to apply for VSI ... is a final and irrevocable decision to leave the active component of the Marine Corps. Requests to withdraw applications will not normally be approved.'" *Id.* (quoting unidentified Marine Corps directive). Before receiving notice that his VSI application had been approved, Captain Gallucci tried twice to avoid or delay the VSI separation, without actually submitting a formal request through Marine Corps channels to withdraw his VSI application. *Id.* He received notice on August 23, 1994 that his resignation had been approved,

and that his effective date of separation would be September 15, 1994. *Id.* Captain Gallucci finally submitted his request to withdraw the VSI resignation on September 9, 1994. *Id.* The Commandant of the Marine Corps denied his request to withdraw his resignation on September 15, 1994 because "'the request for separation was made voluntarily.'" *Id.* (quoting unidentified portion of the administrative record). Captain Gallucci continued his efforts to withdraw his resignation after he was honorably discharged. *Id.* at 636–37.

The court examined whether Captain Gallucci's attempts to withdraw his resignation were "summarily refused." *Id.* at 642. Mere refusal of a request to withdraw a resignation is not enough to prove involuntariness: "all the conditions precedent to granting such a request [must be] fulfilled." *Id.* When Captain Gallucci finally made his withdrawal request, it was no longer timely. *Id.* at 637, 642 (noting that the VSI program required withdrawal requests to be made 45 days before the scheduled separation date). Therefore, the court found that the Corps' denial of the withdrawal request "comport[ed] with the applicable Marine Corps regulations and cannot be held to have been wrongful." *Id.* at 642. The court also noted that ignorance of regulations regarding the withdrawal of a resignation is "not accepted as an excuse for failure to comply." *Id.* Finding the resignation to be voluntary, the court dismissed Captain Gallucci's complaint for lack of subject matter jurisdiction. *Id.* at 645.

Other military pay plaintiffs claiming involuntary separation due to frustrated attempts to withdraw resignations have had their claims dismissed for lack of jurisdiction. *See, e.g., Scarseth v. United States,* 52 Fed. Cl. 458, 478 (2002) ("The Army did not improperly fail to allow the plaintiff to withdraw his resignation."); *Brown,* 30 Fed.Cl. at 231 (stating that the plaintiff's attempt to withdraw his resignation was untimely because it was submitted after his resignation had been accepted). Plaintiff has cited no pay case, nor is the court aware of one, where a military plaintiff's resignation or retirement application was rendered involun-

tary due to a frustrated attempt to withdraw the voluntary retirement application or resignation. The relevant authorities require that involuntariness of a retirement application be shown by a timely request to withdraw the application, *see Gallucci*, 41 Fed.Cl. at 642 (stating that a timely request to withdraw resignation is a "condition[ ] precedent to granting such a request"); *Brown*, 30 Fed.Cl. at 231 (finding an attempted withdrawal untimely because submitted after voluntary resignation accepted), and by the denial of a procedural right guaranteed by statute or regulation, *see Cunningham*, 423 F.2d at 1385 (finding that "both the [Air Force] and the Civil Service Commission erred in denying plaintiff's procedural rights under the Veterans' Preference Act"). Further, in the military pay context the authorities indicate that the decision to accept or deny a request to withdraw a retirement application lies solely within the discretion of the service, *see Brown*, 30 Fed.Cl. at 230–31 (noting that the decision is discretionary and that the denial of a request for withdrawal of resignation "must be granted substantial deference"), and that the plaintiff's ignorance of the procedural requirements for a request to withdraw a retirement application is no excuse for failing to follow those procedural requirements, *see Gallucci*, 41 Fed.Cl. at 642–43 (noting that Captain Gallucci's ignorance of the 45–day rule under which a resignation withdrawal request could be timely filed was no excuse for failing to properly request the withdrawal of his resignation and holding that his resignation was voluntary).

Plaintiff alleges in briefing that he made attempts to "withdraw or revoke" his retirement orders, Pl.'s MSJ at 13, and that "[p]laintiff did not fail to request withdrawal of his retirement application." Plaintiff's Op-

position to Defendant's Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, for Judgment on the Administrative Record and Response to Defendant's Opposition to Plaintiff's Motion for Review of Decision on the Basis of the Administrative Record (Pl.'s Opp.) at 5. The parties addressed these allegations in detail at oral argument. Tr. at 14–47, 53–55, 58, 61. The parties are in fundamental disagreement as to plaintiff's allegations that he made attempts to "withdraw or revoke" his retirement orders and that "plaintiff did not fail to request withdrawal of his retirement application." [9]

The only contemporaneous evidence before the court of the revocation of plaintiff's retirement orders is the Orders 138–8 of May 18, 1995 which revoke the August 18, 1994 retirement orders. AR at 285. Copies of the paperwork that might have triggered the revocation are not in the record. AR at 285, Tr. at 22–23.

Plaintiff's version of the triggering action is that Mr. Jefferson and plaintiff talked about when to revoke his retirement orders and they decided to hold off. Tr. at 24 ("[T]here was no reason to revoke those orders then."). Later, when retirement was imminent, plaintiff alleges that he and Mr. Jefferson submitted plaintiff's request for revocation of the retirement orders. *Id.* at 24–25 (explaining that "the idea [plaintiff] had of revoking [his] orders before ... is now [May 1995] a good idea"). Plaintiff's version has some support in two statements from Mr. Jefferson in the record, one written in 1996, AR at 74, and one written in 2000, Supplement to the Administrative Record (AR Supp.) at 6. Mr. Jefferson's statement in 1996 puts the emphasis on Mr. Jefferson's assistance to plaintiff in changing his sched-

9. The regulation governing a request for withdrawal of a Regular Army officer's retirement application is Army Regulation 635–100 ¶ 4–12. This regulation does not address a possible relationship between a change in retirement orders and the process of withdrawal of a retirement application. *Id.* One subsection of the regulation addresses the standard for approval of a request for withdrawal of a retirement application. *See* Army Reg. 635–100 ¶ 4–12(a)(1) ("A request for withdrawal [of an application] will not be approved except for extreme compassionate reasons or for definitely established convenience of the service."). A different subsection addresses the standard for approval of a change in the date of a pending retirement. *See* Army Reg. 635–100 ¶ 4–12(a)(2) ("A request for change in the retirement date will not be approved unless extenuating circumstances arise which justify an exception to policy."). To the extent a relationship between requests for changes in retirement orders and requests for withdrawal of retirement applications may be inferred from the structure of the regulation, the processes are separate and distinct.

uled retirement in the light of changing circumstances: "I advised [plaintiff] to delay the revocation of the orders since the medical process would be completed before the retirement date. In May 1995, the medical process was not completed, and I requested revocation of LTC Lynn's retirement orders." AR at 74. In his 2000 statement, Mr. Jefferson uses different phrasing and puts the emphasis on plaintiff's decision to request the revocation of his retirement orders: "At the request of retired LTC Lynn I forwarded a request for revocation of his approved retirement to DA [Department of the Army], DA approved the revocation and the retirement orders were revoked." AR Supp. at 6.

Defendant's version of the triggering action is that plaintiff's retirement orders were suspended due to medical treatment and disability evaluation processing. Tr. at 42–44. Defendant's version is supported by the IG Letter written in 2001 communicating the results of an inquiry requested by plaintiff into his retirement.[10] AR at 44–47. The Army Inspector General Assistance Division reviewed several documents from the Physical Evaluation Board Liaison Officer (PEBLO) at Fort Hood, including an affidavit by plaintiff dated May 17, 1995 "stat[ing] that [plaintiff] desired retention on active duty in the Army beyond the scheduled date of expiration of [plaintiff's] term of service," a copy of a memorandum dated May 17, 1995 entitled "Subject: Retention Past Scheduled Release Date, LTC Milton N. Lynn" and a statement detailing where the memorandum had been faxed and mailed on May 17, 1995, including delivery to the Retirement Section of Fort Hood where Mr. Jefferson worked.

AR at 45. Defendant's version is also in accord with a review of plaintiff's disability evaluation by the United States Army Physical Disability Agency in 1998 which stated that "[plaintiff's] [r]etirement orders [were] suspended due to pending medical treatment." AR at 108.

The court reviewed Army regulations in order to clarify the procedures that triggered the revocation of plaintiff's retirement orders. Retirement orders are briefly described in Army Regulation 635–100 ¶ 4–4:

a. Orders announcing retirements will be issued by PERSCOM, at the earliest possible date.

. . . .

c. Once an order has been issued and official notification of retirement approval has been dispatched, orders will not be amended or revoked except for extreme compassionate reasons or for the good of the service. Amendment or revocation must occur prior to the date of retirement.

Army Reg. 635–100 ¶ 4–4. This regulation does not specify the procedures or forms that should be used to revoke retirement orders. *Id.*[11]

The absence of reference to procedures or forms in the sparsely-worded text of Army Regulation 635–100 ¶ 4–4 does not mean that forms and procedures were not available to guide Army personnel in submitting a request for revocation of retirement orders. Paragraph 4–4 of Army Regulation 635–100 is located in Chapter Four of Army Regulation 635–100 dealing with retirements of Regular and Reserve officers. Chapter

---

**10.** The letter to plaintiff begins, "This is the final response to your Inspector General (IG) assistance requests and your December 12, 2000, letter to the Secretary of Defense concerning your retirement." AR at 44.

**11.** Officers scheduled for retirement may be retained on active duty beyond their retirement date due to disability processing. This option is discussed in Army Regulation 635–40 Physical Evaluation for Retention, Retirement, or Separation ¶ 3–7 (Aug. 15, 1990):

*Retaining soldiers on active duty after scheduled nondisability retirement or discharge date*

A soldier whose normal scheduled date of nondisability retirement or separation occurs during the course of hospitalization or disability

evaluation may, with his or her consent, be retained in the service until he or she has attained maximum hospital benefits and completion of disability evaluation if otherwise eligible for referral into the disability system.

*a.* Officers and warrant officers on extended active duty may be retained on active duty according to the provision of AR 635–100, chapter 3 [chapter dealing with releasing of Reserve officers on active duty].

Army Reg. 635–40 ¶ 3–7. This regulation also does not specify the procedures or forms that should be used to revoke retirement orders which must be amended or revoked in order to allow time for a disability evaluation to be completed. *Id.*

Three, which deals with the release from active duty of non-regular (Reserve) officers, describes more detailed personnel procedures and forms used in military separations including retirements. *See generally* Army Reg. 635–100 ¶¶ 3–1 to 3–104. Chapter Three, although not applicable by force of law to plaintiff's retirement, describes procedures and forms that appear to be consistent with those used in May 1995 in plaintiff's request for revocation of his retirement orders. For example, Army Regulation 635–100 ¶ 3–8 titled "Medical/dental care required, or sick in hospital when period of service expires" outlines how a Reserve officer's personnel situation is handled when medical treatment and disability processing interfere with a scheduled release from active duty:

a. An officer undergoing release from active duty (voluntary or involuntary) or completion of expiration of term of service, may only be considered for retention past the established release date when continued hospitalization is required and/or physical disability processing is required, or has been initiated. The request for retention will be submitted to HQDA according to paragraph *d* below. Officers determined medically fit for retention/separation will not be retained past established release date.

b. An officer undergoing retirement (voluntary or involuntary) under chapter 4 due to length of service or maximum age will not be retained on active duty unless the medical condition requires referral of the case to a physical evaluation board (para 4–37). When retention is required the hospital commander will notify Cdr, PERSCOM ... and request the officer's retirement orders to be rescinded. The request will include—

(1) The medical diagnosis(es).

(2) A certification by the medical facility commander that the case will be referred to a physical disability evaluation board.

(3) Expected date or date case was transmitted to a physical evaluation board.

(4) Certification that the officer consents to the revocation of retirement orders.

(Revocation of retirement orders requires Cdr, PERSCOM ... approval.)

c. Officers will not be retained on active duty beyond their scheduled release or retirement date without written consent which must be signed by the individual concerned. (See fig 3–1.) .... The consent affidavit will be attached to the request for retention or request for revocation of retirement orders ....

d. Commanders of Medical Treatment Facilities (MTF) will forward an application for retention, endorsed by the officer's unit commander to Cdr, PERSCOM .... A request for retention requires approval by HQDA and will include the following information:

....

(4) A copy of the retention affidavit. Army Reg. 635–100 ¶ 3–8. Figure 3–1 of Chapter 3 is a sample affidavit which contains no mention of Reserve status and the text of which concludes: "Wherefore, in consideration of the above [fully advised of rights and advantages of staying on active duty pending hospital care and/or physical disability evaluation], I (*Do/Do not*) desire retention on active duty in the Army beyond the scheduled date of expiration of my term of service." Army Reg. 635–100 fig. 3–1. The court notes that, in plaintiff's case, an affidavit and request for retention, contemporaneous with the revocation of plaintiff's retirement orders, were produced by the PEBLO at Fort Hood for review by the Army Inspector General Assistance Division. The court believes that a reasonable interpretation of Mr. Jefferson's actions as reflected in his statements that he "requested revocation of LTC Lynn's retirement orders," AR at 74, and that "[a]t the request of retired LTC Lynn I forwarded a request for revocation of his approved retirement," AR Supp. at 6, would be that these actions were ministerial tasks involving the forwarding of documents originating with the PEBLO. The court concludes, as did the Army Inspector General Assistance Division, that "while [Mr. Jefferson] may have submitted [plaintiff's] request for revocation of [plaintiff's] retirement, the preponderance of physical evidence indicates that [plaintiff's] retirement was revoked

pending the Physical Evaluation Board (PEB)." AR at 45.

Plaintiff's view of the legal effect of the revocation of retirement orders is that the retirement application is also revoked or withdrawn. Pl.'s Resp. at 3 ("Plaintiff asserts that there is no distinction between revocation of retirement orders and withdrawal of an application."). According to plaintiff, "[the retirement application] is dead once the orders are issued, and once the orders issue, and they are revoked, there is no viability to the application." Tr. at 26. Plaintiff offered no authority for this interpretation. Tr. at 26–27. Revocation of military orders is discussed in Army Regulation 600–8–105 Military Orders: "Revoke an order when it is void and was without effect from the beginning."[12] Army Reg. 600–8–105, Format 705 Amendment of orders, fig. 2–6 at 25 n. 7 (Oct. 28, 1994). This regulation does not, however, clarify the relationship between retirement orders and an approved retirement application. The text of Army Regulation 635–100 ¶ 4–4 does not treat retirement orders as synonymous with an approved retirement application. The statements "Orders announcing retirements" and "Once an order has been issued and official notification of retirement approval has been dispatched" in Army Regulation 635–100 ¶ 4–4 do not, by their terms, support plaintiff's assertions that "there is no distinction drawn in the regulatory scheme for distinguishing between applications and orders," Tr. at 26, or plaintiff's assertion that "the orders become the embodiment of the application, and once it's acted upon ... the application has no legal efficacy." Tr. at 26–27.

Defendant's view is that when retirement orders are revoked, the revocation does not affect the underlying approved retirement application. See Tr. at 46 ("The Army ... has always assumed that the retirement application remained effective, that it was suspended in light of the disability evaluation in order to allow that to continue. When a final determination was made in the disability process, that ... application became effective.").

Defendant's view has support in the interpretation of Physical Evaluation Board (PEB) procedures given by the Chief of the Army's Retirements and Separations Branch in 1999:

> SUBJECT: Retirement Processing in Conjunction with Medical Holds
>
> 1. When a soldier has an approved retirement and orders have been published, those orders are revoked if that soldier is pending evaluation of a PEB. The retirement remains approved, only the orders are revoked. Upon notification that the soldier is cleared by the PEB for retirement, a new PRCN [PERSCOM Retirement Control Number] is issued authorizing publishing of new orders. A new request for retirement is not required since the original retirement remained approved.

AR at 230.

PEB policies and documents also support this view. On May 31, 1996 the Physical Disability Branch announced that "[i]f this soldier [plaintiff] was scheduled for separation or retirement for reasons other than physical disability, that separation or retirement action may continue." AR at 255. "Scheduled for retirement" is a term that is defined in U.S. Army Physical Disability Agency Policy Memorandum # 4—Presumption of Fitness Rule ¶ 5(a) (Apr. 10, 1993):

> a. USAPDA applies the presumption of fitness rule to the categories of dispositions described below.
>
> . . . .
>
> (2) Category II: The soldier is scheduled for retirement at the time of referral into the disability system. Scheduled for retirement includes approved voluntary retirement application; revocation of retirement orders for purposes of MEBD/PEB processing; . . . .

AR at 135–36. Because plaintiff's revocation of retirement orders was for purposes of PEB processing, he was in the category of "scheduled for retirement" and his retirement application was still effective. Therefore, the revocation of his retirement orders

---

**12.** This regulation was in effect when Orders 138–8 were issued. Orders 138–8 utilized For-

mat 705.

did not withdraw or revoke his retirement application. This interpretation is consistent with the fact that the Army issued plaintiff's second set of retirement orders on June 10, 1996, shortly after the disability evaluation was complete. AR at 250. The court agrees with the IG Letter which concluded in 2001 that "the regulations governing retirement and the Physical Evaluation Board process do[ ] not have explicit details on the effects of revocation on a retirement request." AR at 44. But here the weight of the evidence supports defendant's view that the revocation of the retirement orders did not revoke plaintiff's retirement application. *See* Tr. at 35 ("[T]his [revocation] is a ministerial matter which has the effect of merely suspending Mr. Lynn's voluntary retirement in order to allow the military disability evaluation to go forward.") Plaintiff has not shown by a preponderance of the evidence that the revocation of his first set of retirement orders constituted a withdrawal of his retirement.

The court has scoured the record for any evidence of a timely request to withdraw plaintiff's retirement application. Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Reynolds,* 846 F.2d at 748. If plaintiff attempted to withdraw his retirement application but did not follow the procedures for doing so, ignorance of those procedures is no excuse for his failure to file a timely request to withdraw his retirement application. *See Gallucci,* 41 Fed.Cl. at 642 ("Ignorance of the law is not accepted as an excuse for failure to comply.").

Here, there is no evidence that plaintiff filed any request to withdraw his voluntary retirement application, still less a timely request. *See* AR at 2 (Mr. Karl F. Schneider commenting on "the lack of any documentation showing Mr. Lynn's intent to withdraw his retirement application"). Instead, the record indicates that plaintiff pursued disability retirement through the disability eval-

uation process for approximately two years. AR at 255–365. The record also indicates that a disability retirement might have offered some advantages over voluntary retirement.[13] Def.'s MTD at 6; Pl.'s Resp. at 2–3; *see also* Army Reg. 635–100 ¶ 3–8 (noting potential advantages associated with separation based on disability). Plaintiff has not shown that he attempted to withdraw his retirement application as permitted by Army Regulation 635–100 ¶ 4–12, despite almost two years in which to do so. Plaintiff has not met his burden to prove that he filed a timely request to withdraw his retirement application.

Even assuming that plaintiff had filed a timely request to withdraw his retirement application, plaintiff has not shown that he was denied procedural rights guaranteed by statute or regulation. *See Cunningham,* 423 F.2d at 1383 (concluding plaintiff was denied procedural rights). Plaintiff had notice of the discretionary standard under which requests for withdrawal of retirement applications are approved. *See* AR 34 (quoting, in the retirement application plaintiff signed, Army Regulation 635–100 ¶ 4–12(a)(1) which gives the standard for approving withdrawal requests). The retirement application plaintiff signed cited the pertinent regulation for request for withdrawal of application procedures and plaintiff's signature on the application served as an acknowledgment that plaintiff was familiar with that regulation. *Id.; see also* Army Reg. 635–100 ¶ 4–12 (citing Headquarters of the Department of the Army (HQDA) as approval authority and noting the need for endorsements from commanders that route such requests through channels to PERSCOM). Plaintiff has offered no evidence that he was prevented from submitting a request to withdraw his retirement application by any affirmative act of the United States. There is no record of a request for withdrawal of plaintiff's retirement application being endorsed and for-

13. The parties discussed possible advantages of a disability retirement over a voluntary retirement during oral argument. Tr. at 56–57, 66–70. Plaintiff appears to have preferred disability retirement over voluntary retirement. *See* AR at 261–62 (copy of plaintiff's request in May 1996 for review of final PEB findings that he was not disabled). The court notes that the delays associ-

ated with disability evaluation beyond plaintiff's first scheduled retirement date added a year of active duty to plaintiff's service which, according to plaintiff's formula for calculating non-disability retirement benefits, would have increased his retirement benefit from approximately 62.5% to approximately 65% of plaintiff's monthly base pay. Pl.'s Resp. at 2–3.

warded through channels to PERSCOM and HQDA. There is no record that a request for withdrawal of plaintiff's retirement application was denied. Because plaintiff understood his withdrawal rights and has not shown that he was denied these rights to request a withdrawal of his voluntary retirement application, plaintiff has not met his burden to prove he was denied procedural rights to withdraw his retirement application.

Plaintiff's retirement was voluntary, and was not rendered involuntary by any frustrated attempt to withdraw his retirement application.

## III. Conclusion

The court finds that plaintiff retired voluntarily on June 30, 1996. Because the court lacks jurisdiction over back pay claims related to voluntary retirements from the military, defendant's Motion to Dismiss for Lack of Jurisdiction is GRANTED. Defendant's Motion for Judgment on the Administrative Record is MOOT. Plaintiff's Motion for Review of Decision on the Basis of Administrative Record is DENIED. The Clerk shall DISMISS the complaint. No costs.

IT IS SO ORDERED.